The KANAWHA VALLEY BANK, a corporation, and the Raleigh County Bank, a corporation, Plaintiffs,

v.

NELLO L. TEER COMPANY, a corporation, Defendant and third-party Plaintiff; The Aetna Casualty & Surety Company, a corporation, and S. A. Furrow et al., third-party Defendants.

Civ. A. Nos. 1563, 1566.

United States District Court,
S. D. West Virginia,
Charleston Division.

Jan. 4, 1955.

Jackson, Kelly, Holt & Moxley, Thomas B. Jackson, Andrew L. Blair, Gary Joe Triplett, Charleston, W. Va., for plaintiff Kanawha Valley Bank.

Ross & Ross, Charles T. Ross, Jr., Beckley, W.Va., for plaintiff Raleigh County Bank.

Kay, Casto & Chaney, Robert H. C. Kay, Vincent Chaney, Charleston, W. Va., for Nello L. Teer Co., defendant and third-party plaintiff.

Steptoe & Johnson, Stanley C. Morris, Charles B. Gates, Jr., Charleston, W. Va., for Aetna Casualty & Surety Co., third-party defendant.

O. L. Hedrick, Beckley, W. Va., for S. A. Furrow, third-party defendant.

MOORE, Chief Judge.

Plaintiffs sue in separate actions, later consolidated, as assignees of one S. A. Furrow. Furrow was a sub-contractor of defendant, which was employed as contractor to do certain work for the West Virginia Turnpike Commission in the construction of the Charleston-Princeton Turnpike. A brief summary of the material facts giving rise to the claims is as follows:

Plaintiff The Kanawha Valley Bank being the sub-assignee of plaintiff The Raleigh County Bank, and the rights of both plaintiffs being founded on the same principles and series of transactions, both these banks will be referred to in the singular herein as "Bank," unless the context requires differentiation. Defendant will be referred to as "Teer." The Aetna Casualty and Surety Company will be referred to as "Aetna."

As a result of negotiations between Furrow and Teer, Furrow was employed by Teer as sub-contractor to haul stone for use in laying the base underneath the Turnpike's concrete surface. Furrow was to haul a minimum of 20,000 tons of stone per work-day at 26.5 cents per ton,

the total estimated tonnage to be hauled being 878,887. If Furrow failed to maintain the minimum production, Teer reserved the right to hire additional equipment to make up the 20,000 tons, to pay for such hired equipment, and to deduct such payment from monies due Furrow for work performed. Furrow agreed to furnish a surety and performance bond in the amount of $160,000. (Such a bond was written on February 19, 1954, with Aetna as surety.) Furrow was to finance his own operations, and was to be paid on the basis of approved current estimates, less 10% retainage, within five days after payments should be received by Teer from the Turnpike Commission.

Prior to the execution of the written agreement between Furrow and Teer on February 18, 1954, Furrow took certain steps to provide for financing the work. The pleadings and affidavits show these to be that under date of February 17, 1954, Furrow wrote Teer the following letter:

"You will please consider this letter as your authorization to pay all estimates due me on your Contract 30 to the Raleigh County Bank, Beckley, West Virginia. These payments are to be made after you have deducted all monies owed to you by me for petroleum products, etc. Such payments are to be made to the Raleigh County Bank from the first monies due me after the above mentioned deductions."

Teer on the same day wrote the following letter to the Bank:

"Relative to the hauling contract on our Contract 30, West Virginia Turnpike Commission between S. A. Furrow and Nello L. Teer Company, Mr. Furrow has given us a letter of authorization for payment of all estimates to be made to you. Such payments are to be made from the first monies due him after the deduction of all monies owed by S. A. Furrow to Nello L. Teer Company for petroleum products bought by us for Mr. Furrow's account.

"It is agreed that such payments will be made to you upon receipt of our estimates from the West Virginia Turnpike Commission."

On February 18, 1954, the Bank wrote the following letter to Furrow (with carbon copy to Teer):

"You have requested a line of credit with our bank not to exceed $25,000.00 to permit you to enter into a hauling contract with Nello L. Teer Company in order that you may be able to meet your payrolls maturing before receiving payment from the Nello L. Teer Company.

"Our committee has discussed your request and we have decided to furnish you funds on the funds to meet your payroll and other expenses in the sum not to exceed $25,-000.00 or an amount consistent to the conditions that may exist at the time of your request based on the security of the Nello L. Teer Company acceptance and your own financial standing during the time of such advances. No doubt you will furnish us statements of your financial status from time to time that we may request and other information that we may want."

Furrow proceeded to haul stone under his hauling contract with Teer, and from time to time rendered invoices to Teer at the contract price less 10% retainage. (Sometimes the deduction for retainage was only 5%.) He assigned these invoices to the Bank. They were accepted and agreed to be paid by Teer and were then used as collateral for notes in the exact amounts of the respective invoices which Furrow negotiated with the Bank. This system of financing was put into operation first on April 12, 1954. On that date, an invoice rendered by Furrow to Teer was assigned by Furrow to the Raleigh County Bank as collateral security for a loan. This invoice was guaranteed by Teer in the same manner as the subsequent invoices which are now the subjects of this suit. Evidently, it was paid, since it is

not included in the claims now made by the Banks. A number of other such invoices were used in the same way, and were paid by Teer. The form of the assignments by Furrow and the acceptances and agreements by Teer will be set out in connection with the description of the invoices sued on by the Banks.

During several days early in June, Furrow failed to meet the minimum requirement of 20,000 tons per day, and Teer, as agreed in its contract with Furrow, employed additional trucks to make up the minimum, at a cost to Teer of $6,538.50. On July 12th, Teer again hired additional trucks to bring the tonnage of stone delivered up to the required amount, but it does not appear how much was paid for these additional trucks.

On July 24th, numerous checks to materialmen given by Furrow were outstanding and had been dishonored by the Bank on which they were drawn. On that day (July 24) Teer received from the Turnpike Commission payment for Furrow's current estimates, being the invoices herein sued on by the Banks. On July 26th, Furrow ceased to work and it was necessary for Teer to make other arrangements to have the Furrow contract completed.

Teer asserts as a defense to the Banks' claims that because of Furrow's defaults it has been compelled to pay for hiring additional trucks and equipment to finish the contract, including those hired in June and July, a sum in excess of $40,000. It further says that it has incurred liabilities and obligations for a large sum of money over and above the amount expended for additional trucks and equipment, and will be required to incur additional obligations in the future. The exact amount thereof is not ascertainable, it says, because (as of the date of the answers) the work has not been completed.

As a further defense, Teer says that it is legally liable to pay the claims of materialmen and laborers on the Furrow job on Furrow's failure to pay them; that it has already paid to such persons approximately $25,000; that there remain unpaid claims amounting to more than $60,000; and that the amount of all such claims both paid and unpaid is greater than the total amount earned by Furrow and in defendant's hands at any time subsequent to Furrow's assignments to plaintiff.

Aetna and Furrow were brought into the case by defendant's counterclaims for interpleader, F.R.C.P. 22, 28 U.S.C.A., contained in its answers, wherein it is stated that on July 26, 1954, defendant had in its hands an amount of money above $50,000 earned by Furrow under his contract. About half of this sum represents money which was later paid out by defendant as above-mentioned on claims of materialmen and laborers, and the remaining sum, defendant says, is still in its hands. As a basis for the interpleader, defendant says that Aetna has notified it that it claims all the money earned by Furrow and held by defendant, by virtue of an assignment which Aetna claims was made to it by Furrow prior to the execution of the "purported" assignments by Furrow to plaintiff; and that Furrow has also notified it that he claims the money for himself.

Aetna, as part of the affidavit of Rex Roth, files its assignment, which is a part of Furrow's application for the bond, and is dated February 18, 1954. It covers deferred payments and retained percentages under Furrow's contract, and is to become effective in event of Furrow's default, including default in the payment of premiums, none of which was ever paid. It does not appear that the Bank knew of this assignment at the time it made the loans to Furrow, secured by the assigned invoices.

Aetna also files the affidavit of its agent, J. A. Nuckols, to the effect that he informed the President of the Raleigh County Bank, about March 29, 1954, that Aetna "disliked" its financing arrangements with Furrow, and that the president "agreed" to terminate the arrangement.

The two invoices which are the basis of the claim of the Kanawha Valley Bank are in the amount of $11,529 covering stone hauled from June 9 to June 17, 1954, and $11,599.44 covering stone hauled from June 17 to July 1, 1954. The amount of the first of these invoices is arrived at by deducting a 10% retainage from the total amount of the invoice, $12,810.90. The second shows a total of $17,351.70 from which has been deducted a 5% retainage, and there is also a deduction designated "less gas", $4,884.67. The first of these invoices is dated June 17, 1954, and the second, July 2, 1954. Each was accepted by Kanawha Valley Bank as collateral on a note of S. A. Furrow, each of the notes being in the exact net amount of the respective invoices, the first note being dated June 18, 1954, payable thirty days after date, the second being dated July 2, 1954, payable forty days after date.

The Raleigh County Bank's claim also is represented by two invoices from Furrow to Teer, the first of which is in the net amount of $19,270.49, covering stone hauled from May 30 to June 9, 1954, less 10% retainage of $2,141; the other is in the net amount of $8,374.53, covering stone hauled from July 1 to July 10, 1954, less 5% retainage of $440.-77. The date of the first of these invoices is June 11, 1954, and of the second, July 12, 1954. They were accepted as collateral by the Raleigh County Bank on two notes. One note is dated July 12th in exactly the same amount as the second of the invoices, and payable thirty days after date. The other is dated July 15th, in the amount of $2,682.04, payable thirty days after date. It is explained in the Raleigh County Bank's complaint, and not denied in Teer's answer, that the Bank originally loaned Furrow on June 11, 1954, the total amount of $19,270.49; that on July 6, 1954, Teer paid the Bank $16,588.45; and that the balance of $2,-682.04 was then accepted by the Bank as collateral security for the second note.

All the invoices exhibited bear the following written words:

"I hereby assign the above to the Raleigh County Bank, Beckley, W. Va.
* * *

"(s) S. A. Furrow
S. A. Furrow

"We hereby accept the above assignment and payment of the same will be made in accordance with our letter of Feb. 17, 1954.

"Nello L. Teer Co.
By (s) Robert E. Tidwell"

Those sued on by The Kanawha Valley Bank were assigned to it by The Raleigh County Bank.

There are now pending two motions on the part of the Banks. One of these is a motion for summary judgment on their respective claims. Numerous affidavits pro and con have been filed in connection with this motion. The other is a motion to dismiss Aetna and Furrow as third-party defendants. It is also to be noted here that after Aetna was brought into the actions as a third-party defendant it impleaded a large number (33 in all) of persons, firms and corporations alleged to be laborers and materialmen of Furrow under his hauling contract. Obviously, if the Banks' motion to dismiss is granted, it will apply to Aetna, Furrow, and all these other parties; while a finding for plaintiffs on their motions for summary judgment will dispose of the cases entirely.

I proceed, therefore, to a consideration of the motions for summary judgment.

No case can be decided summarily on motion unless it appears from a consideration of all the pleadings and affidavits filed that no substantial issue of fact is presented as between the parties to the motion. In order to determine whether or not there is such an issue, all statements of fact must be considered. However, there may be conflicting statements of fact which, while raising substantial issues under one legal theory, are immaterial under another.

Thus, if it is found that the transactions between Teer and the Banks established contractual relationships whereby the Banks acquired independent

rights against Teer not traceable to their position as assignees, then, in the absence of substantial conflicting evidence as to the contracts, or of defenses available directly against the assignee, as distinguished from those asserted against the assignor, the Banks are entitled to summary judgments.

If there were no such contracts, the case would resolve itself into a controversy over priority of assignments and the availability of sets-off against those assignments. No summary judgment could be properly rendered in such a case, since the pleadings and affidavits are replete with conflicting statements of fact which would be relevant to an inquiry of that nature.

The defendant relies on the proposition that an assignee of a non-negotiable chose in action stands in the shoes of his assignor, and takes the assignment subject to all the defenses and sets-off available to the debtor against the assignor. This is an elementary principle of the law of assignments, but we must examine the circumstances to decide whether or not it is applicable here.

■ In my opinion it is not. No one, I think, would dispute the proposition that a debtor may freely contract with his creditor's assignee with reference to the assigned debt. If by the contract the debtor agrees unconditionally to pay the debt to the assignee, the assignee no longer stands in the shoes of the assignor, and is not chargeable with offsets which would have been available to the debtor in the absence of such a contract.

The Court is called upon in this case to decide whether the correspondence between Teer and the Raleigh County Bank, together with Teer's acceptance and agreement to pay the particular assigned invoices which are the subjects of the Banks' claims, in the light of all the dealings between the Raleigh County Bank and Teer as shown by the pleadings and the affidavits, constituted a contract or contracts on the part of Teer to pay the amounts of these invoices to the Raleigh County Bank.

■ It is immaterial, I think, whether the original correspondence between Teer and the Bank, supplemented by Furrow's letter to the Bank, amounted to a contract, an equitable assignment, or a mere plan of financing to be followed in the future. The contracts which result in plaintiffs' recovery here are created by defendant's accepting, respectively, the assignment of each invoice and agreeing to make payment of "the same" in accordance with its letter of February 17, 1954. This fixes the amount which defendant is to pay in each case. It is the amount of the assigned invoice. The phrase "in accordance with our letter of Feb. 17, 1954" limits defendant's obligation no further than to postpone payment to the date when estimates were received from the Turnpike Commission, and, if deductions were to be made "for petroleum products," to allow for such deductions. (None are claimed.)

We have here not a mere acknowledgement by Teer that it has received notice of the respective assignments, but an outright agreement, in unmistakable terms, that it will pay the amounts of the invoices to the Bank.

Ample consideration for Teer's agreement to pay the assigned invoices existed, not only in the benefit which flowed to Teer through the financing of Furrow, his sub-contractor, by the Bank, but also in the risk assumed by the Bank in accepting the assignments as collateral and extending credit to Furrow.

Teer had stipulated that Furrow do his own financing, but obviously it was to its advantage that Furrow should successfully finance his work, because presumably Teer would reap a profit from Furrow's work, this being an essential part of Teer's contract with the Turnpike Commission. Teer made itself a part of Furrow's plan of financing by accepting and agreeing to pay to the Bank invoices as they were rendered by Furrow.

The clearest statement which has been cited to me setting forth the rules gov-

erning cases such as these is found in Batavian Bank v. Minneapolis, St. P. & S. S. M. Ry. Co., 1904, 123 Wis. 389, 101 N. W. 687, 688. There, as here, there was an assignment of an account to a bank and an acceptance of the assignment by the debtor, by the words: " 'The net amount thereof, after deducting cost of transportation and other reasonable charges, to be paid to said bank when adjusted and due.' " Defendant sought to set off sums due to it for merchandise sold to the assignor. The Court said, 101 N.W. 687, at page 688:

"It was entirely competent for the bank to take assignments of the invoices in question, and such assignments alone would transfer good title thereto, subject, of course, to all proper offsets which the defendant then had against the assignor. No consent on the part of the defendant was necessary to accomplish this result. But such assignments alone would be a doubtful security, * * *. It would seem almost a demonstration from the wording of the assignment that this was the very difficulty which the written agreement * * * was intended to meet and correct. Obviously the purpose of that agreement was to make the assigned invoice better security; otherwise it was unnecessary. The bank evidently wished a direct acknowledgment of the account, and an agreement to pay the proceeds to itself instead of to the assignor. * * *

"When the bank received the assigned invoice, with this agreement attached, and loaned money * * * on the faith thereof, its right to recover thereon in the event of nonpayment of the loan rests upon the principles of the law of contracts, which are so well understood as to require no further statement."

Since I have concluded that Teer may not set off against the Banks any claims which it may have against Furrow, and since no defenses are interposed other than claims against Furrow, it fol-lows that the Banks are entitled to summary judgments in the amounts for which they have brought suit.

All questions of recoupment and offset are matters which may be litigated among Teer, Aetna, and Furrow; perhaps also with the materialmen and laborers who furnished goods and services to Furrow; but such litigation if engaged in is not by any definition ancillary to the issues in the present suit. I know of no rule of federal procedure which would permit this case to be retained by the Court after summary judgment for plaintiffs merely to litigate independent and unrelated rights and liabilities between defendant and the other parties who have been brought in. In view of the conclusion reached, it can only be held that the impleading of Aetna, Furrow, and the laborers and materialmen was improvidently allowed.

An order may be submitted granting plaintiffs summary judgments for their claims, and thereupon dismissing this action from the docket of the Court.